TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
        1100/1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-6527/2424/3819
        Facsimile: (213) 894-6269/0141
        E-mail:    Scott.Paetty@usdoj.gov
                   Catherine.S.Ahn@usdoj.gov
                   Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
        1400 New York Avenue NW, 3rd Floor
        Washington, DC 20530
        Telephone: (202) 320-0539
        Facsimile: (202) 514-0152
        E-mail:    Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>ARTUR AYVAZYAN,<br><br>              Defendant. | No. CR 20-00579-SVW-3<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ARTUR AYVAZYAN; DECLARATION OF CATHERINE AHN WITH ATTACHED EXHIBIT 1 (FILED UNDER SEAL) AND EXHIBIT 2<br><br>Sentencing: November 15, 2021<br>Time:        11:00 a.m.<br>Location:   Courtroom of the<br>                  Hon. Stephen V. Wilson |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, Assistant United States Attorneys Catherine Ahn, Scott Paetty, and Brian Faerstein, and Department of Justice Trial Attorney Christopher Fenton, hereby files its sentencing position regarding defendant Artur Ayvazyan.

The government's sentencing position is based upon the attached memorandum of points and authorities, the declaration of Catherine Ahn and accompanying exhibits, the presentence investigation report, the files and records in this case, and any other evidence or argument that the Court may wish to consider at the time of sentencing.  The government reserves the right to file any supplemental sentencing positions that may be necessary.

Dated:   November 8, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____

CATHERINE AHN
SCOTT PAETTY
BRIAN FAERSTEIN
Assistant United States Attorneys
CHRISTOPHER FENTON
Department of Justice Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.............................1

I.    INTRODUCTION...............................................1

II.   RELEVANT FACTUAL AND PROCEDURAL HISTORY....................2

      A.   Defendant's Charges, Testimony and Convictions, and
           Motions..............................................2

      B.   The Presentence Investigation Report and Objections.......5

III.  THE COURT SHOULD ADOPT THE PSR'S CALCUATION OF DEFENDANT'S
      CRIMINAL HISTORY CATEGORY AND THE GOVERNMENT'S RECOMMENDED
      OFFENSE LEVEL OF 37.......................................7

      A.   Defendant's Recommended Offense Level Calculation
           Ignores the Overwhelming Evidence at Trial and
           Conflicts with Jury's Verdicts.......................7

           1.   The Conspirators' Attempts to Obtain
                Approximately $21.7 Million in Fraudulent Loans
                and Launder the Received Funds was Reasonably
                Foreseeable to Defendant........................8

           2.   The Court Should Adopt the Enhancements for Ten
                or More Victims, Sophisticated Means, Possession
                and Use of Identification, and Reject Defendant's
                Attempt to Apply a Mitigating Role Reduction.......13

      B.   Defendant's Offense Level Should be Increased by Two
           Levels Based on the Vulnerable Victims Enhancement
           Pursuant to U.S.S.G. § 3A1.1(b)(1)......................17

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION................21

      A.   A Custodial Sentence of 260 Months Is Sufficient But
           Not Greater than Necessary to Meet the Goals of 18
           U.S.C. § 3553(a).....................................21

      B.   The Court Should Order Restitution and Forfeiture........24

V.    CONCLUSION................................................25

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**CASES**

Gall v. United States, 552 U.S. 38 (2007)...........................21

Molina-Martinez v. United States, 136 S.Ct. 1338 (2016)............21

United States v. Blitz, 151 F.3d 1002 (9th Cir. 1998)...........9, 10

United States v. Carty, 520 F.3d 984 (9th Cir. 2008)...............21

United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998)
    (unpublished)..................................................20

United States v. Etoty, 679 F.3d 292 (2012).......................20

United States v. Grimes, 173 F.3d 634 (7th Cir.1999)..............20

United States v. Lloyd, 807 F.3d 1128 (9th Cir. 2015).......8, 9, 10

United States v. Miller, 953 F.3d 1095 (9th Cir. 2020).............9

United States v. Ovsepian, 739 Fed. Appx. 448 (9th Cir. October
    5, 2018)...................................................14, 15

United States v. Peters, 962 F.2d 1410 (9th Cir. 1992)............20

United States v. Treadwell, 593 F.3d 990 (9th Cir. 2010)...........9

**STATUTES**

18 U.S.C. § 1028(d)(1).............................................15

18 U.S.C. § 1028A...................................................8

18 U.S.C. § 1956................................................5, 8

18 U.S.C. § 3553(a)......................................21, 22, 24

California Penal Code 261(a)(2).....................................6

**OTHER AUTHORITIES**

U.S.S.G. § 1B1.3..............................................8, 9, 14

U.S.S.G. § 2B1.1..............................................passim

U.S.S.G. § 2B1.6.............................................14, 15

U.S.S.G. § 2S1.1.................................................5, 7

U.S.S.G. § 3A1.1........................................6, 7, 17, 20

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

U.S.S.G. § 3B1.2..............................................7, 17

U.S.S.G. 2B1.1(b) ...............................................14

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3    On June 25, 2021, a jury convicted defendant Artur Ayvazyan of

4  conspiracy to commit bank fraud and wire fraud (count 1), eleven

5  counts of wire fraud (counts 2 through 12), eight counts of bank

6  fraud (counts 13 through 20), aggravated identity theft (count 24),

7  and conspiracy to commit money laundering (count 26).  (ECF 1128,

8  Revised Presentence Investigation Report ("PSR"), ¶¶ 1-7; see also

9  ECF 154, Superseding Indictment ("FSI").)  Specifically, beginning in

10  March 2020 through at least August 2020, defendant conspired with his

11  wife, his brother, his sister-in-law, his cousin-in-law, and others

12  to use real and false personal identifiers to create false and

13  synthetic identities and businesses, submit fraudulent Paycheck

14  Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL")

15  applications on behalf of those fictitious entities as well as

16  businesses they controlled, obtain and spend the fraudulent loan

17  proceeds, and launder those proceeds through bank accounts.  (PSR

18  ¶¶ 19-75.)  These accounts were in the names of defendant and his

19  coconspirators, as well as the false and synthetic business and

20  individual identities created and used by them.  (Id.)  In total,

21  defendant and his co-conspirators sought $21,768,962.26 in fraudulent

22  loan proceeds and obtained $17,723,141.26.  (See Exhibit 1 attached

23  to Decl. of Catherine Ahn ("Ahn Decl.") (filed under seal).)

24    For this conduct, the government recommends that this Court find

25  a total offense level of 37, which – when combined with defendant's

26  criminal history category of I – yields an advisory guidelines range

27  of 210 to 262 months' imprisonment.  The government respectfully

28  recommends that the Court impose a sentence of 236 months, at the

mid-point of the guidelines range, plus the mandatory consecutive sentence of 24 months' imprisonment for count 24, for a total of 260 months' imprisonment.  The government further recommends that the Court impose a concurrent period of supervised release of five years on counts 1-20, three years on count 26, and one year on count 24, with the conditions recommended by the U.S. Probation Office ("USPO"), order defendant to pay $17,723,141.26 in restitution, the $2,200 special assessment, and order the forfeiture of the property identified in the jury's special verdict from as to defendant (ECF 646).  (See ECF 1127 (USPO Revised Recommendation Letter) at 1-4.)

## II.   RELEVANT FACTUAL AND PROCEDURAL HISTORY[1]

### A.   Defendant's Charges, Testimony and Convictions, and Motions

On March 9, 2021, a grand jury returned a first superseding indictment against defendant and seven codefendants, charging conspiracy to commit bank fraud and wire fraud, substantive wire fraud and bank fraud counts, aggravated identity theft, and conspiracy to commit money laundering.  (ECF 154.)  On June 15, 2021, defendant and three of his co-conspirators – brother Richard Ayvazyan, sister-in-law Marietta Terabelian, and cousin-in-law Vahe Dadyan – went to trial.  Defendant was convicted of all counts charged against him.  (ECF 644, Redacted Verdict Form.)  Defendant's wife, Tamara Dadyan, pleaded guilty to counts 1, 24, and 26 prior to trial, and – following defendant's convictions - filed a motion to withdraw her guilty plea.  (ECF 525, 541, and 998.)

At trial, defendant took the stand and, under oath, attempted to

---

[1] The government provided an extensive summary of the facts presented at trial related to defendant Artur Ayvazyan in its opposition to defendant's Rule 29 and 33 motion (ECF 793), and incorporates by reference the factual background contained therein.

convince the jury and this Court that his wife, co-defendant Tamara Dadyan (who did not appear before the jury at trial), was solely responsible for the voluminous amount of incriminating evidence found in his possession.  Despite testifying that he lacked so much trust in his wife that he refused to file taxes with her and kept her separated from the finances for his business, Allstate Towing and Transport, defendant claimed that he handed her the tax forms for that very same business and permitted her to submit PPP and EIDL loan applications without even knowing their amounts.  (6/23/21 A.M. Tr. 101:24-103:19 and 108:3-110:12.)

Defendant also tried to explain away the overwhelming proof of his direct participation in the charged conspiracy found on his phone.  This evidence included personal identifying information for individuals and businesses used in fraudulent PPP and EIDL applications (see Government Trial Exhibit ("GEX") 24b), handwritten instructions to make changes to identification cards ("IDs") followed by images of false and fraudulent IDs matching those instructions (see GEX 24a at 16-19), and numerous images of checks and debit/credit cards in names of individuals and businesses used in the fraud and money laundering conspiracies (see GEX 24c).  Defendant also possessed copies of confirmations of the very same loan applications whose amounts he allegedly did not see (see GEX 24d).

Defendant's explanation as to the voluminous evidence of fraud found on his phone was the same as for the assembly line of fraudulent documents found at his home – that the false IDs and incriminating evidence was "likely" put there by his wife, Tamara Dadyan.  (6/23/21 A.M. Tr. 102:14-103:7 and 104:22-105:21.) According to defendant's own testimony, defendant routinely handed

3

Tamara Dadyan his phone, despite allegedly previously finding other persons' IDs on his phone, confronting her about them, and then supposedly erasing them. (Id. at 88:25-89:4.)   Defendant also testified that – despite mistrusting her to the point of refusing to file their taxes together - he was nonetheless willing to make deposits for her and transport escrow documents on her behalf. (Id. at 88:25-89:4 and 101:24-103:19; see also Exhibit 2 (attached to Ahn Decl.) (showing selected text messages and attachments from GEX 10 describing "Art's" participation in recruiting other individuals to submit PPP and EIDL applications, his knowledge and use of accounts into which fraudulent loan proceeds were to be transferred, references to deposits he would make, and participation in the creation of checks.)

In contrast, defendant testified that his brother, Richard Ayvazyan, who had not pleaded guilty and was contesting the charges at trial with defendant, was a "great guy" to whom he had transferred fraudulent loan proceeds (albeit only after first transferring it through two other bank accounts) simply to repay a supposed business loan from many years earlier. (Id. at 89:5-18 and 111:18-113:4; see also GEX 115 at 7.)

The jury rejected defendant's inconsistent testimony and attempt to shift all blame to his wife, Tamara Dadyan, and convicted defendant of all counts for which he was charged.

Following defendant's convictions, defendant moved for a judgment of acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. (ECF 686, 687.)   The government opposed, and on August 20, 2021, the Court denied defendant's motions, finding them "largely conclusory" and that "there was

4

overwhelming evidence of Defendant's guilt." (ECF 875 at 11.) The Court further concluded that "[t]he evidence in this case does not preponderate heavily against the verdict. Instead, it preponderates heavily in favor of the verdict against Defendant." (Id. at 12.)

**B. The Presentence Investigation Report and Objections**

The USPO filed its revised PSR, its addendum in response to the parties' objections, and revised recommendation letter on November 8, 2021, in which it calculated a criminal history category of I and total offense level of 35, yielding an advisory guidelines range of 168 to 210 months' imprisonment for counts 1-20 and 26, plus a mandatory consecutive term of 24 months' imprisonment for his aggravated identity theft conviction in count 24. (See PSR ¶¶ 81-113, 115-125, and 176-178 and ECF 1129 ("Addendum").) The USPO's offense level calculation of 35 was based on the following: a base offense level of 7 (see U.S.S.G. § 2B1.1(a)(1)); +20 for a loss between $9.5 million and $25 million (see U.S.S.G. § 2B1.1(b)(1)(K)); +2 for ten or more victims (see U.S.S.G. § 2B1.1(b)(2)(A)(i)); +2 for sophisticated means (see U.S.S.G. § 2B1.1(b)(10)); +2 for the use of identifications[2] (see U.S.S.G. § 2B1.1(b)(11)); and +2 for defendant's conviction for violating 18 U.S.C. § 1956 (see U.S.S.G. § 2S1.1(b)(2)(B)). (PSR ¶¶ 81-112.)

The USPO recommended that this Court impose a total sentence of 192 months' imprisonment (comprised of 168 months' imprisonment at the low-end of the advisory guidelines range, plus the mandatory consecutive 24 months for count 24), to be followed by five years of

---

[2] Although the PSR and addendum referred to identifications found in defendant's possession (PSR ¶¶ 98-99 and Addendum at 4), the government respectfully recommends the Court apply it for possession and use of authentication features, as further discussed, below.

5

supervised release, and order restitution of $17,723,141.26.  (ECF 1127 at 1-7.)

Both parties timely filed objections to USPO's initial calculation of defendant's offense level, with the government recommending an additional two-level vulnerable victims enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) for a total offense level of 37, and defense recommending a total offense level of 16.  (See ECF 1038 ("Def. PSR Obj.") at 12; CR 1041 ("Govt. PSR Obj.") at 2-4; and Table 1, infra at 7.)  The government also provided to defendant and to the USPO updated loan and loss charts showing an intended loss of $21,768,962.26, and an actual loss of $17,723,141.26.  (See Ahn Decl. Exhibit 1.)

Neither party objected to the USPO's calculation of defendant's criminal history category as I, which was based on one criminal history point derived from defendant's disorderly conduct conviction in 2015.  (PSR ¶¶ 122, 124-125.)  Defendant currently faces a pending 133-count felony indictment in the Los Angeles County Superior Court for numerous mortgage fraud, theft, money laundering, forgery, and conspiracy counts, among others, for which his wife Tamara Dadyan and brother Richard Ayvazyan are also charged.  (PSR ¶ 127.)  On November 4, 2021, defendant was arrested by the Los Angeles Police Department for violating California Penal Code 261(a)(2): Rape: Force/Fear/Etc.[3] (ECF 1113 at 2-3.)

A table showing the parties' offense level calculations based on the recommended criminal history category of I is included, below:

---

[3] According to California Penal Code 261(a), the statute outlaws "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator" (emphasis added).  As such, the victim of the alleged rape does not appear to be co-defendant Tamara Dadyan.

**Table 1.  An Overview of the Recommended Offense Level Calculations**

| Offense Level Calculation (PSR with +2 Recommended by Govt.) | | USSC Provision |
|---|---|---|
| Base Offense Level | 7 | 2B1.1(a)(1) |
|    Loss > $9.5 million < $25 million | +20 | 2B1.1(b)(1) |
| Ten or More Victims | +2 | 2B1.1(b)(2)(A)(i) |
| Sophisticated Means | +2 | 2B1.1(b)(10) |
| Possession/use of Authentication Features | +2 | 2B1.1(b)(11) |
| Conviction for 18 USC 1956 | +2 | 2S1.1(a)(1) |
| *Govt. Recommended:  Vulnerable Victims* | *+2* | *3A1.1(b)(1)* |
| **PSR Total Offense Level:** | **35** | |
| **With Govt. +2 Recommendation:** | **37** | |

| | Low | Mid | High |
|---|---|---|---|
| Guidelines Range (based on OL 37) | 210 | 236 | 262 |
| Plus 24 Months (1028A/count 24) | 234 | 260 | 286 |
| *Govt. Proposed Recommendation:  260 months' imprisonment* | | | |

| Defense Offense Level Calculation | | USSC Provision |
|---|---|---|
| Base Offense Level | 7 | 2B1.1(a)(1) |
|    Loss of > $250,000 < $550,000 | +12 | 2B1.1(b)(1) |
| Mitigating Role Reduction | -3 | 3B1.2 |
| Def. Recommended Total Offense Level | 16 | |

| | Low | Mid | High |
|---|---|---|---|
| Guidelines Range (based on OL 16) | 21 | 24 | 27 |
| Plus 24 Months (1028A/count 24) | 45 | 48 | 51 |

**III.  THE COURT SHOULD ADOPT THE PSR'S CALCUATION OF DEFENDANT'S CRIMINAL HISTORY CATEGORY AND THE GOVERNMENT'S RECOMMENDED OFFENSE LEVEL OF 37**

    **A.  Defendant's Recommended Offense Level Calculation Ignores the Overwhelming Evidence at Trial and Conflicts with Jury's Verdicts**

The government concurs with the PSR's offense level calculation (but see footnote 2, supra) but further recommends a +2 vulnerable victims enhancement, as discussed below, for an overall offense level of 37.  (Govt. PSR Obj. at 2-4.)

Defendant, by contrast, argues for an overall offense level of 16, less than half that calculated by the PSR and the government, by

7

excluding from the scope of defendant's relevant conduct all loans
other than the two he received in the name of his business, Allstate
Towing and Transport.  (Def. PSR Obj. at 8.)  Defendant's
recommendation should be rejected.  The scope of relevant conduct
asserted by defendant directly conflicts with the principles of the
U.S.S.G. and Ninth Circuit caselaw and ignores the evidence
supporting the jury's verdict for counts for which he was convicted.
In short, defendant relies on a counterfactual reality wholly at odds
with the overwhelming weight of evidence against him and the import
of the jury's verdict in seeking to reject all enhancements and argue
for a -3 mitigating role reduction.  (Def. PSR Obj. at 2-3, 6-12.)
Defendant's recommended offense level also blatantly conflicts with
the straightforward application of the guidelines as to substantive
counts of conviction, including the inclusion of loans associated
with Anna Dzukaeva – the identity that was the basis for defendant's
18 U.S.C. § 1028A conviction (count 24) – and the +2 enhancement
required for a conviction under 18 U.S.C. § 1956 (count 26).

> 1. <u>The Conspirators' Attempts to Obtain Approximately
> $21.7 Million in Fraudulent Loans and Launder the
> Received Funds was Reasonably Foreseeable to Defendant</u>

At sentencing, a defendant is responsible for "all reasonably
foreseeable acts and omissions of others in furtherance of the
jointly undertaken criminal activity, that occurred during the
commission of the offense of conviction, in preparation for that
offense, or in the course of attempting to avoid detection or
responsibility for that offense." <u>United States v. Lloyd</u>, 807 F.3d
1128, 1142-45 (9th Cir. 2015) (citing U.S.S.G. § 1B1.3(a)(1)(B)).  As
such defendant is accountable for the conduct of his conspirators
that are: "(i) in furtherance of the jointly undertaken criminal

activity; and (ii) reasonably foreseeable in connection with that criminal activity." Id. (citing United States v. Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010) (overruled on other grounds in United States v. Miller, 953 F.3d 1095 (9th Cir. 2020) and United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998)). While the district court need not "proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy," it must make particularized findings about "'the scope of the criminal activity the particular defendant agreed to jointly undertake.'" Blitz, 151 F.3d at 1012-13 (quoting U.S.S.G. § 1B1.3, cmt. n. 2).

Defendant's entire position on the scope of relevant conduct depends on the mistaken argument that he should only be held accountable for loans he directly submitted. The Court already rejected a similar argument when sentencing defendant's co-defendant, Vahe Dadyan. And for good reason. Defendant's argument is inconsistent with how relevant conduct is analyzed in the scope of jointly undertaken criminal activities, like the conspiracies for which defendant was convicted (counts 1 and 24). For example, in Lloyd, the Ninth Circuit explained how this analysis works in an analogous context:

> [T]he scope of a joint undertaking for sentencing purposes depend[s] on whether the telemarketers worked together, relied on one another to make a sale, attended the same sales meetings, and depended on the success of ... the operation as a whole for their financial compensation. If two defendants, working together, design and execute a scheme to sell fraudulent stocks in a telephone boiler-room operation, each is accountable for all the fraud losses that result. The conduct of each is in furtherance of their jointly undertaken criminal activity and is reasonably foreseeable in connection with that criminal activity. To determine a defendant's fraud-loss amount and resulting offense level, a district court must consider that defendant's role in the overall scheme.

9

Lloyd, 807 F.3d at 1142-1143 (citing Treadwell, 593 F.3d at 1005 (quoting Blitz, 151 F.3d at 1013), among others) (internal quotations omitted).

The evidence in this case demonstrates that defendant – like his wife, Tamara Dadyan, and other coconspirators with whom he directly conspired – should be held accountable for the full scope of the conspiracy.  Defendant was not merely involved in the submission of loan applications related to his own business.  As extensively discussed in the Government's Opposition to Defendant's Rule 29 and 33 motions, the text messages exchanged between his wife (Tamara Dadyan) and his brother (Richard Ayvazyan), the evidence discovered on defendant's own phone, the evidence found in his home, and even his own testimony at trial show that defendant was intimately aware of the manner and scale of the conspiracy and should be held accountable for the full scope of its associated losses.  (ECF 793 ("Govt. Opp. to Rule 29 and 33 Motions") at 2-13; see also Ahn Decl. Exhibit 2.)  For example, as reflected in one of his wife's texts to his brother, stating that "Tom coming over now I told art to show him the decline letter from the eidl and its simple its 35 percent for ppp," defendant was aware of the submission of other PPP and EIDL loan applications and actively recruited other individuals to help submit them.  (GEX 10 at 18; see also Ahn Decl. Exhibit 2 and Testimony of Special Agent Massino (6/21/21 P.M. Tr. 71:4-75:2).)

Defendant also participated in and benefited from the use of accounts belonging to other individuals or entities to receive, transfer, and spend the resulting fraudulent loan proceeds.  (See Ahn Decl. Exhibit 2.)  This stands in stark contrast to defendant's assertion in his objections to the PSR that his knowledge and involvement extended only to the loans he obtained for his own

business – an assertion rejected by the jury's verdict holding him guilty of substantive counts of bank fraud, wire fraud, and aggravated identity theft.  For instance, defendant received a "wire for Art for $73,500" (as described in his wife's and brother's text messages) that was transferred through his "best friend" Thanh P. Tran's New Acre Farm account and the Runyan Tax Service account and roughly constituted 35% of a loan earlier obtained as part of the conspiracy.  (6/21/21 P.M. Tr. 71:4-75:2 and GEX 10-24.)  A copy of the front and back of Thanh Tranh's driver's license, and a confirmation for the PPP application for New Acre Farm Produce were further found in defendant's own phone.  (See GEX 24b at 20, 27-28, and GEX 24d at 12.)

Defendant's awareness of the overall scheme is further demonstrated by his possession of numerous check images, debit/credit cards, and actual screenshots of PPP and EIDL application confirmations beyond the two loans he received for his direct business, Allstate Towing.  (See GEX 24b, 24c, and 24d.)  The names of individuals and businesses found on his phone reflect those used in the PPP and EIDL fraud, along with the accounts used to receive and launder the resulting proceeds, showing his actual knowledge of and participation in the full scope of the fraud and money laundering conspiracies.  This evidence further includes fraudulent California IDs, as well as copies of handwritten notes describing what to put on these fraudulent IDs, including two versions of a California Driver's License bearing different photographs for Anna Dzukaeva (see GEX 24b at 1-4), Osbaldo Velasquez (see GEX 24b at 8-9), and Miykhailo Diuzehnko (see GEX 24b at 11-14).  Defendant's phone also contained screenshots of confirmations of loans in amounts that differed from

the loans obtained for his business, Allstate Towing, and included confirmations for fictitious businesses used in the conspiracy to receive loans, such as "Green Label nutrienrs" (see GEX 24d at 5), LK Designs (see GEX 24d at 10), and individuals other than himself, such as Alak Mikhaelian (GEX 24d at 7) and Mikhael Diuzehnko (see GEX 24d at 7 and 11).

As such, defendant's argument that the scope of his relevant conduct should be limited to the two loans applied for in the name of his business, totaling $274,000, is simply not credible.  (Def. PSR Obj. at 8.)  Most tellingly, defendant does not even include as relevant conduct the loan applications associated with Anna Dzukaeva, the identity theft victim whose name and date of birth defendant and co-defendant Tamara Dadyan used without lawful authority as the jury found in convicting defendant of count 24.  But just as implausibly, defendant's argument wholly ignores the evidence and statements of coconspirators directly linking defendant to affirmative acts in furtherance of the fraud and money laundering conspiracies.  (See Ahn Decl. Exhibit 2.)

The PSR rightly focused on the scope of the jointly undertaken criminal conduct in analyzing defendant's relevant conduct. (Addendum at 2-3.)  Based on the overwhelming evidence of defendant's knowledge and participation in the fraud and money laundering conspiracies, the principles set forth in the U.S.S.G., and corresponding Ninth Circuit authority, the full scope of those conspiracies was foreseeable to defendant and he should be held accountable for all of the loans sought, and actually received, as a result.  The Court should therefore adopt the intended loss of $21,768,962.26 and actual loss of $17,723,141.26 incurred against the

more than ten victims of defendant's criminal conduct.  (See Ahn
Decl. Exhibit 1.)

       2.   <u>The Court Should Adopt the Enhancements for Ten or
More Victims, Sophisticated Means, Possession and Use
of Identification, and Reject Defendant's Attempt to
Apply a Mitigating Role Reduction</u>

          *a.   The Court Should Adopt the PSR's Recommendation
that the Ten or More Victims Enhancement Applies
Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i)*

Given the basis of defendant's objection to the PSR's
application of the +2 enhancement for ten or more victims was its
improperly narrow definition of relevant conduct, the Court should
adopt the PSR's application of the +2 enhancement for ten or more
victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).  (Def. PSR Obj. at
8-9 and PSR ¶ 95.)  As indicated in the attached loans and loss
chart, there were more than ten victims as a result of defendant's
conduct.  (See Ahn Decl. Exhibit 1; see also Addendum at 3.)

          *b.   The Court Should Adopt a +2 Enhancement for
Possession or Use of an Authentication Feature
Pursuant to U.S.S.G. § 2B1.1(b)(11)(A)(ii)*

The intricacy of the fraud and money laundering conspiracies'
use and transfer of numerous identities, real and fake businesses,
and financial accounts is exemplified by the evidence found on
defendant's own phone.  This evidence and the immigration documents
and records found at his residence in the names of his foreign
exchange student and visitor victims further show defendant's
knowledge of and involvement in conduct that falls squarely within
the +2 enhancement described in U.S.S.G. § 2B1.1(b)(11).

If the offense involved

      (A) <u>the possession or use of any . . . (ii) authentication
feature</u>; (B) the production or trafficking of any
(i) unauthorized access device or counterfeit access

> device, or (ii) authentication feature; or (C) (i) the
> unauthorized transfer or use of any means of identification
> unlawfully to produce or obtain any other means of
> identification, or (ii) the possession of 5 or more means
> of identification that unlawfully were produced from, or
> obtained by the use of, another means of identification

increase by 2 levels.

U.S.S.G. 2B1.1(b)(11) (emphasis added).

While defendant is eligible to receive the +2 enhancement under either U.S.S.G. § 2B1.1(b)(11)(A)(ii), (B)(i), (B)(ii), (C)(i), and/or (C)(ii), the government respectfully recommends this Court apply the enhancement based on U.S.S.G. § 2B1.1(b)(11)(A)(ii), as affirmed in United States v. Ovsepian, 739 Fed. Appx. 448 (9th Cir. October 5, 2018).  In that case, the panel rejected the defendant's argument that applying the +2 enhancement under U.S.S.G. § 2B1.1(b)(11) was impermissible "double-counting" prohibited by U.S.S.G. § 2B1.6 cmt. App. Note 2.  739 Fed. Appx. at 448.  The note states that where a sentence for aggravated identity theft is imposed with one "for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense.  A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)."  Id. (emphasis added).

In Ovsepian, the district court applied the enhancement not for means of identification, but for the authentication features found on the copies of driver's licenses maintained by defendants in fake patient files.  (ECF 23, Government Answering Brief, United States v.

14

<u>Ovsepian</u>, Case No. 18-50026, at 26.)  An authentication feature is defined by statute and in the guidelines as a "hologram, watermark, certification, symbol, code, image" or other feature used on an identification document or means of identification to determine its authenticity.  18 U.S.C. § 1028(d)(1) and U.S.S.G. § 2B1.1, cmt. App. Note 1, 10(A).  The features highlighted in these California Driver's Licenses included the images – a photograph – of their bearers, a hologram, and other markings the verify authenticity.  The Ninth Circuit affirmed the district court's application of the enhancement, holding that "Despite Appellants' argument to the contrary, under the facts in this case, Application Note 2 to section 2B1.6 did not bar the two-level authentication-feature enhancement under U.S.S.G. § 2B1.1(b)(11)(A)(ii).  Accordingly, the district court did not err in applying the two-level enhancement under U.S.S.G. § 2B1.1(b)(11)(A)(ii)."  <u>Ovsepian</u>, 739 Fed. Appx. at 448.

Similarly, the Court in this case should hold defendant accountable for the multiplicity of authentication features found in his possession.  This includes copies of California Drivers Licenses in names that were not his own clearly showing watermarks, seals, raised lettering, and signatures of the identified cardholder, including for Roza Avakian, Thanh Tran, Anastasia Rysik, Egia Kapemyan, Tony Gleb, Viktoria Babetska, and Leoncio Galver, more. (<u>See</u> GEX 24b.)  The possession of these California Driver's Licenses, along with copies bearing different photographs but the same signature image, additional watermarks and other indicia of authenticity, also renders defendant eligible for the enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(b)(ii) (production of any authentication feature).  (<u>Id.</u>; <u>see</u> also GEX 24a at 16-19 (showing

1    handwritten notes directing the information to be included in an

2    identification document and the fraudulent California Driver's

3    License bearing the instructed information along with a photograph,

4    the image of a signature, watermarks/background images, and other

5    authentication features).)

6            *c.   The Court Should Adopt the PSR's Recommendation*
             *that the Sophisticated Means Enhancement Should*
7            *Apply Pursuant to U.S.S.G. § 2B1.1(b)(10)(A)(i)*

8        A +2 sophisticated means enhancement is applicable where "he

9    offense otherwise involved sophisticated means and the defendant

10   intentionally engaged in or caused the conduct constituting

11   sophisticated means," defined as "especially complex or especially

12   intricate offense conduct pertaining to the execution or concealment

13   of an offense."  U.S.S.G. § 2B1.1(b)(10) and App. Note 9(B).  The

14   voluminous number of fake IDs, the careful reproduction of the

15   signatures, watermarks, and other forms of authentication on those

16   fake IDs found in defendant's possession (see GEX 24a and 24b), the

17   use of victims' PII to open numerous financial accounts in their

18   names and the fake businesses used to submit PPP and EIDL

19   applications, and then launder the resulting proceeds through

20   multiple accounts (see GEX 24c, GEX 24d, and Exhibit 2 at 1-2

21   (selected excerpts from GEX 10)), all provide ample basis for the

22   sophisticated means enhancement.  Therefore, this Court should adopt

23   the PSR's recommendation to apply this enhancement to defendant's

24   offense level.  (PSR ¶ 96; see also Addendum at 3.)

25           *d.   A Mitigating Role Reduction Should Not Apply*

26       Furthermore, given defendant's active participation in the

27   conspiracies for which he was convicted, including assisting in

28   recruiting individuals into the conspiracy and making the financial

                                    16

transactions that enabled the parties to obtain, launder, and spend the fraudulent proceeds, defendant does not qualify for a mitigating role reduction.  (See PSR ¶¶ 105-106 and Def. PSR Obj. at 10-12.) Such reductions apply to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity."  U.S.S.G. § 3B1.2 App. Note cmt. 3(A).  Defendant could hardly be considered substantially less culpable than an average participant in this conspiracy. Indeed, the voluminous amount of incriminating evidence found in his home and on his phone demonstrates just the opposite.  Such evidence includes, among other things, the personal identification documents, images of checks and debit/credit cards in the names of individuals used in the PPP/EIDL fraud and money laundering conspiracies, and confirmations of PPP/EIDL loans submitted as part of the scheme.  The evidence also reflects defendant's knowing and active use of the information of foreign exchange students and visitors (as evidenced by his conviction for count 24) to perpetrate those crimes.

Defendant's argument for a mitigating role is, as with his other arguments, based on his attempts to ignore the overwhelming evidence supporting, and fact of, his convictions and should be rejected by the Court.

> **B.   Defendant's Offense Level Should be Increased by Two Levels Based on the Vulnerable Victims Enhancement Pursuant to U.S.S.G. § 3A1.1(b)(1)**

The government respectfully recommends that this Court adopt the offense level calculated by the USPO (offense level 35) but further apply a two-level increase because defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).  Defendant not only targeted individuals that

17

qualify as vulnerable victims – either through the deceased status of the individuals used to submit the fraudulent applications and launder the resulting proceeds, or their foreign immigrant status, which rendered them uniquely unable to respond to the fraudulent use of their names and information.[4]  As described at trial, one of the deceased individuals used by the coconspirators to submit fraudulent loan applications was Alak Mikaelian.  (GEX 10 at 9.)  When Richard Ayvazyan praised his credit score, he noted "You can do 2 on this guy," to which Tamara Dadyan replied, "Let's go the fool is dead on armo land."  (Id.)  When Richard inquired about personal accounts, Tamara Dadyan responded "Yes wells" and forwarded information regarding a PPP applications.  (Id.)  A copy of a Wells Fargo check for an account in the name of Alak Mikaelian and the front and back of a Wells Fargo Visa Platinum Debit Card, also in the name of Alak Mikaelian, was found on defendant's phone.  (GEX 24c at 6-8.)

      As detailed above and in previous filings, defendant knew of the foreign immigrant status of many of the individuals used by him and his coconspirators to submit fraudulent PPP and EIDL filings and laundering the resulting proceeds, including the victim of count 24, Anna Dzukaeva, and others, such as Liudmyla Kopytova.  (Govt. Opp. to

---

[4] This is the same reasoning used to apply the vulnerable victims enhancement to co-defendant Richard Ayvazyan.  The USPO applied the enhancement based on his targeted use of deceased father-in-law Nazar Terabelyan's name and information and that of Iulia Zhadko, a real Ukranian exchange visitor, to apply for and then transfer the fraudulent loan proceeds.  (See ECF 1121 (Revised PSR for Richard Ayvazyan) at ¶¶ 62-64 and ECF 1122 (Second Addendum to the PSR for Richard Ayvazyan) at 2.)  The government is seeking a similar enhancement for Tamara Dadyan; the USPO in that PSR declined to apply the enhancement because the government had not directly shown the connection to the money laundering conspiracy, which the government will address in its sentencing memorandum for Tamara Dadyan.  (See ECF 1001 (Govt. Response to Tamara Dadyan PSR) and ECF 1119 (Addendum to the PSR for Tamara Dadyan) at 2.)

Rule 29 and 33 motions at 4-8.)  The evidence found on defendant and Tamara Dadyan's phone shows that he not only assisted in the use and transfer of fraudulent California Driver's Licenses bearing authentication features (as detailed above) for these victim immigrants, he knew of and assisted in the laundering of the resulting proceeds.  (See Exhibit 2 (excerpts of GEX 10) and GEX 24c and 24d.)  Images for a check in the name of Anna Dzukaeva and the front and back of a debit card bearing the name of Liudmyla Kopytova were further found on his phone.  (GEX 24c at 5, 9-10).

The application of the vulnerable victims enhancement is supported by the plain language of the guidelines and Ninth Circuit opinions.  According to the U.S.S.G., the vulnerable victims enhancement applies to an individual that is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1(b)(1) App. Note 2.  The purpose of the adjustment is to punish and deter criminals like defendant from victimizing those who cannot protect themselves:

> The "vulnerable victim" sentencing enhancement is intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal.  Because criminals incur reduced risks and costs in victimizing such people, a higher than average punishment is necessary to deter the crimes against them. . . . Defrauders who direct their activities not against banks, insurance companies, or large investors, but instead against people [with] . . . mental or educational deficiencies, . . . do not need to take as many precautions against the discovery of their scheme by the intended victims and in any event are less likely to be prosecuted, because the victims are less  likely to know that they have been defrauded or if they know to have the know-how and initiative required to press a criminal complaint or bring a civil suit.

United States v. Etoty, 679 F.3d 292, 296 (2012) (quoting United States v. Grimes, 173 F.3d 634, 637 (7th Cir.1999)).

The use of the "dead on armo land" Alak Mikaelian's name and information, and the presence of his Wells Fargo account information on defendant's phone, show that defendant knew of and attempted to use this individual's information in support of the fraud and money laundering conspiracies.  In United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998) (unpublished), the Court affirmed the district court's application of a two-level "vulnerable victim" enhancement where defendant used the identity of a deceased individual to fraudulently obtain a credit card in the deceased's name.  Of note, the district court had found that the families of the deceased were the vulnerable victims, who were particularly susceptible to defendant's conduct at a difficult time.  (Id. (further noting that "[a] vulnerable victim under section 3A1.1 need not be the victim of the offense of conviction").)  "In determining whether a victim is 'particularly susceptible' within the meaning of section 3A1.1(b), a sentencing court must consider the characteristics of the defendant's chosen victim, the victim's reaction to the criminal conduct, the circumstances surrounding the criminal act, and whether the defendant could reasonably have anticipated the victim's reaction."  Cuellar, 165 F.3d at 918 (citing United States v. Peters, 962 F.2d 1410, 1417 (9th Cir. 1992)).

Using the same analysis, the family of Alak Mikaelian and the foreign exchange students targeted by defendant and his coconspirators should also qualify as vulnerable victims.  Alak Mikaelian appears to have died overseas; similarly, the foreign exchange students and visitors had left the United States years prior

to the onset of COVID-19 and were no longer present in the United States to monitor or even respond to the fraudulent use of their information.  That time and distance makes it particularly difficult to detect and address the theft and fraudulent use of their names in a crisis-induced federal loan program.  Like the families of the deceased, these victims' characteristics, their reaction (or lack of ability to react) to the criminal conduct, the circumstances surrounding the criminal act, and whether the defendant could reasonably have anticipated the victim's reaction (or lack of reaction), are all dispositive.  These victims were chosen by defendant and his coconspirators because - given the length of time since the victims had departed the U.S. and their immigrant status – their circumstances made it difficult for them to respond to the fraudulent use of their identities.  As such, the government respectfully recommends that the two-level enhancement be applied to defendant for a total offense level of 37.

## IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A.   A Custodial Sentence of 260 Months Is Sufficient But Not Greater than Necessary to Meet the Goals of 18 U.S.C. § 3553(a)

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  The advisory guidelines range provides the "starting point and . . . initial benchmark" for sentencing.  Molina-Martinez v. United States, 136 S.Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature

and circumstances of the offense and defendant's history and characteristics, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of defendant, § 3553(a)(2)(C); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

Defendant was a knowing and active participant in a massive PPP and EIDL fraud and money laundering scheme that took nearly $20 million in much-needed assistance away from small businesses and their employees. Despite claiming, on the witness stand, that he suffered from a loss in business due to COVID-19 (6/23/21 A.M. Tr. 86:13-23), he readily admitted that he used the loan proceeds to transfer money to his brother, Richard Ayvazyan (id. at 111:12-15), and one of his first recorded expenses after receiving government funds was for a Harley Davidson motorcycle, using an approximately $24,067.15 cashier's check (id. at 122:3-123:1).

Furthermore, despite his attempts to escape the reality of his own conduct, the overwhelming evidence found at his home and on his own phone shows that he played a critical role in producing the actual fraudulent IDs used to submit the fraudulent PPP and EIDL applications. The plethora of fraudulent IDs, ID-making implements, checks, and debit/credit cards found in his phone and his residence shows that he not only knew about the fraud, he actively assisted in one of its most critical aspects – the generation of IDs needed to submit the fraudulent applications and facilitate access to the financial accounts needed to launder the proceeds.

When confronted with the voluminous evidence of his crimes, defendant took the stand and – under oath – spun a fantastical and inherently contradictory tale of how it was all his wife's fault, who was conveniently not present at trial to contest his protestations of innocence at her expense.  Defendant pointed the finger at his wife but not his present-at-trial co-defendant brother, despite sitting through lengthy testimony highlighting the sometimes gleeful text messages between his brother and his wife detailing their, and defendant's own, extensive role in the fraud and money laundering conspiracies.  (See GEX 10 and attachments.)  Defendant's self-serving and false statements were rightly rejected by the jury when they convicted him of all counts charged against him.

Furthermore, defendant continues to try to minimize his conduct, in spite of the jury's clear rejection of his testimony, as evidenced by his attempts to take responsibility for only the loans submitted specifically in his or his business' name.  (Def. PSR Obj. at 6.) This shows that defendant has not understood or accepted, in any meaningful way, the seriousness of the crimes for which he was convicted, or his role in perpetrating those crimes well beyond the mere $274,000 obtained in the name of his business.  A significant term of imprisonment is therefore necessary to protect the public from further crimes of defendant and afford adequate deterrence to criminal conduct as to defendant specifically when he is released from custody.  Given the backdrop of the national catastrophe that defendant exploited in engaging in the callous and brazen fraud and money laundering conspiracies, a significant custodial sentence is also necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

Based on a criminal history category of I and offense level of 37, defendant's guidelines range is 210 to 262 months' imprisonment, plus a mandatory consecutive 24 months for aggravated identity theft (count 24), yielding a total effective range of 234 to 286 months' imprisonment.  Given the aggravating factors described above, including the nature and content of defendant's testimony at trial, a low-end sentence would be insufficient to meet the goals of 18 U.S.C. § 3553(a).  The government therefore recommends the Court impose a sentence of 260 months' total imprisonment, based on 236 months at the mid-point of the guidelines range, plus the mandatory consecutive 24 months for count 24, to be followed by five years of supervised release.  The government recommends that the Court impose a concurrent sentence of 236 months on counts 1-20 and 26, followed by count 24's mandatory consecutive term of 24 months, and a concurrent period of five years of supervised release on counts 1-20, one year of supervision on count 24, and 3 years of supervision on count 26.[5] Such a sentence would be sufficient, but no more than necessary, to meet the goals of 18 U.S.C. § 3553(a).

### B.    The Court Should Order Restitution and Forfeiture

Defendant attempts to evade responsibility for his conduct by arguing that he should only be responsible for $260,000 in loans submitted directly in his or his business' name.  As discussed in detail above, this contradicts the guidelines, Ninth Circuit precedent, and the jury's verdicts.  Based on information obtained from the U.S. Small Business Administration and provided to

---

[5] The maximum term of imprisonment for counts 1-20 is 30 years, two years for count 24, and 20 years for count 26.  The statutory maximum term of supervision for counts 1-20 is five years, one year for count 24, and 3 years for count 26.  (PSR ¶¶ 176-177, 180-187.)

defendant, defendant's conduct – including acts that were foreseeable to him as part of the conspiracy - resulted in an actual loss of $17,723,141.26, based on an intended loss of $21,768,962.26.  (Ahn Decl. Exhibit 1.)  As such, this Court should hold defendant accountable for his conduct and order restitution for $17,723,141.26 and further order payment of the $2,200 special assessment.

Furthermore, at the conclusion of trial, the jury made a series of findings as to defendant's forfeiture of property involved in defendant's offenses of conviction.  Consistent with those findings, the government respectfully requests that the Court include in its judgment and commitment order an order forfeiting the property identified in the jury's special verdict form as to defendant (ECF 646).

## V.   CONCLUSION

For the aforementioned reasons, the government respectfully requests that the Court sentence defendant to 260 months' total imprisonment (comprised of a concurrently served 236 months on counts 1-20 and 26 and the mandatory consecutive term of 24 months on count 24), five years of supervised release (comprised of a concurrently served five years on counts 1-20, 1 year of supervision on count 24, and 3 years of supervision on count 26), order defendant to pay $17,723,141.26 in restitution, order forfeiture consistent with the jury's forfeiture findings, and order $2,200 in special assessments.